UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY GREENE,                    )
                                   )
            Plaintiff,             )    CIVIL ACTION NO.
                                   )    12-11685-DPW
v.                                 )
                                   )
ANDREA CABRAL, ET AL.,             )
                                   )
            Defendants.            )

MEMORANDUM AND ORDER
July 13, 2015

Plaintiff Timothy Greene is a practicing Orthodox Jew who was incarcerated in the custody of the Suffolk County Sheriff's Department ("the Department") from May 2011 to October 2012 and from February 2013 to an unidentified date prior to the hearing in this matter.  Greene contends that during these periods he was denied calorically adequate kosher food as well as access to religious services.  The remaining defendants[1] are individuals who he claims were responsible for his care and custody during the periods of his incarceration.  Greene seeks damages and prospective injunctive and declaratory relief.  Defendants move to dismiss the complaint.

---

[1] This case was initially captioned *Greene* v. *Suffolk County Sheriff Department*, but the Department was terminated as a party on February 27, 2013.

**I.  BACKGROUND**

Greene is a convert to Judaism and practices as an Orthodox Jew.  Compl. ¶ 10.  He alleges that his sincerely held religious beliefs require him to maintain a kosher diet, meaning a diet consistent with Jewish law.  *Id.* ¶ 12.  Greene informed the Department that he needed kosher meals, and he was placed on a list of inmates who receive kosher meals.  *Id.* ¶ 15.  The complaint does not allege when that request was made or when he was placed on the list.  The Department does not provide a kosher breakfast option for inmates, *id.* ¶ 22, instead serving the same meal, prepared with non-kosher utensils, to all inmates, *id.* ¶ 21.  The Department occasionally opened otherwise kosher meals with non-kosher utensils, exposing the food to contaminants, *id.* ¶ 25, and intermingled kosher and non-kosher food on the same trays in a way that violates the rules of a kosher diet.  *Id.* ¶ 27.

The Department served meals that purported to be kosher twice a day during the period of Greene's incarceration.  *Id.* ¶ 29.  These two meals combined typically contained approximately six hundred or fewer calories.  *Id.* ¶ 30.  Greene saved wrappers from some of these meals, and he alleges that on one day he was served two meals totaling only five hundred calories for the entire day.  *Id.* ¶ 31.  On another day he was provided with two meals totaling only seven hundred and ten

calories. *Id.* ¶ 32.  He has provided copies of the labels from those two days as an exhibit to the complaint.  When he complained about his lack of access to calorically adequate kosher food, he was told to eat the non-kosher food or to go hungry.  *Id.* ¶ 34.

Greene also alleges that the Suffolk County House of Correction ("the HOC") severely limited his access to religious services.  There are no regularly held services for Jewish people in custody at the HOC, *id.* ¶ 36, nor are there non-denominational services, *id.* ¶ 36.  Greene was told that rabbis were not offered to inmates, *id.* ¶37.  Non-Jewish inmates in the custody of the department, however, do have access to religious services.  *Id.* ¶ 42.

Greene has alleged violations of federal and state law against numerous administrative defendants.  These defendants are Andrea Cabral, the former Sheriff of Suffolk County, sued in her individual capacity; Steven Tompkins, the current Sheriff of Suffolk County, sued in his individual and official capacities; Gerard Horgan, the former Superintendent of the Suffolk County House of Correction, sued in his individual capacity; Yolanda Smith, the current Superintendent of the Suffolk County House of Correction, sued in her individual and official capacities; and Anne Nee, the Director of Social Services, sued in her individual and official capacities.  Greene initially brought

3

this action *pro se* but never served the defendants.  On January
15, 2013, he began to be represented by counsel.  Greene filed a
first amended complaint on February 26, 2013, and properly
served the defendants.  At that time, Greene also dismissed the
Suffolk County Sheriff's Department as a defendant.  Defendants
moved to dismiss and Greene moved to further amend the
complaint.  He filed a Second Amended Complaint in December
2013.

Greene alleges that he filed grievances on June 18, 21, and
24, 2012, as well as on April 19, 2013, about the food he was
provided.  *Id.* ¶¶ 56, 57, 58, 60, 62.  After filing one of the
grievances, he was told to contact Director Nee, which he did.
She did not resolve his complaint.  *Id.* ¶¶ 58, 59.  On June 16,
2013, he filed a grievance concerning lack of access to non-
denominational or Jewish religious services.  Id. ¶ 63.  The
response he received suggested that Greene contact an outside
rabbi or synagogue to set up a special visit, but Greene does
not have a rabbi he could ask to see him.  *Id.* ¶ 63, 64.  He
followed up with people recommended in the grievance denials,
but received no remedy.  *Id.* ¶ 65.

In the Second Amended Complaint, Greene presents a theory
of supervisory liability against each of the defendants based on
each defendant's role in implementing practices, programs, or
policies that Greene claims caused the violations he alleges.

For former Sheriff Cabral and current Sheriff Tompkins, Greene alleges that each is or was responsible for "overseeing the operation and conditions of the correctional institutions in Suffolk County" and is or was "responsible for promulgating and implementing practices and policies" and ensuring the enforcement of the law.  *Id.* ¶¶ 86, 88.  He claims that each knew or should have known that Jewish inmates lack access to kosher meals, religious services and religious materials.  *Id.* ¶¶ 87, 88.

Former Superintendent Horgan and current Superintendent Smith are alleged to be or to have been "[r]esponsible for supervision and daily operations of the Suffolk County House of Correction" as well as for "promulgating and implementing practices and policies, providing proper training to correctional staff" and ensuring enforcement of the law.  *Id.* ¶¶ 89, 90.  Greene alleges that both knew or should have known that Jewish inmates lacked access to kosher meals, religious services, and materials, in violation of the law, *id.*,  adding that former Superintendent Horgan knew that this was "by Department policy and practice," *id.* ¶ 89, and that Superintendent Smith knew this "[d]ue to her involvement with training, and promulgation of the practices and procedures of the Suffolk County House of Correction," *id.* ¶ 90.

Director Nee is alleged to be responsible for "supervision and daily operation of religious services within the Suffolk County House of Correction." *Id.* ¶ 91. She knew or should have known that Jewish inmates lacked access to calorically adequate kosher meals and religious services in violation of the law "[d]ue to her involvement and implementation of the religious practices and procedures of the Suffolk County House of Correction, and her direct contact with Mr. Greene during the grievance process." *Id.*

Greene further states that the defendants "have each been involved in or are aware of the creation, training, oversight and implementation of the Department's religious programs" including religious services, materials, and diets, and the fact that the diet provided pursuant to these programs "only sometimes complies with the rules of Kashrut and Jewish inmates' sincerely held beliefs." *Id.* ¶ 102. He claims that the defendants "were aware of the risk to Mr. Greene's health and safety and deliberately disregarded that risk" by failing to provide him with sufficient caloric intake. *Id.* ¶ 104. At another point in the complaint, Greene claims that defendants "were each involved in training, and each oversaw or implemented policies, or were aware of the implementation of policies, that provided inmates requiring a Kosher diet[] only two meals a day. Further, Defendants have trained and overseen both the unit

6

officers, chaplains, and kitchen lieutenant, and created the
policies that these subordinates enforce, when they have
resorted to coercive tactics to force Mr. Greene to go without
food or to abandon his sincerely held religious beliefs." *Id*.
¶ 112.

Greene asserts claims in six counts: for (1) violations of
the Religious Land Use and Institutionalized Persons Act of 2000
(RLUIPA), 42 U.S.C. § 2000cc et seq, against defendants
Tompkins, Smith and Nee in their official capacities; for
violations of 42 U.S.C. § 1983 against all defendants based on
infringements of (2) the right to freedom of religion in the
First and Fourteenth Amendments to the United States
Constitution, (3) the right to equal protection in the
Fourteenth Amendment to the United states Constitution, and
(4) the right to be free from cruel and unusual punishment under
the Fourteenth Amendment to the United States Constitution; and
for violations of state civil rights against all defendants
under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch.
12, § 11I, based on infringements of (5) the right to religious
freedom and (6) the right to be free from cruel and unusual
punishment.   Defendants now move to dismiss the Second Amended
Complaint for failure to state a claim upon which relief may be
granted, asserting variously sovereign immunity, qualified
immunity, and inadequate pleading.

## II. LEGAL STANDARD

In resolving a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, I treat as true all non-conclusory factual allegations in the complaint, while identifying and disregarding statements in the complaint that offer "legal conclusions" or "threadbare recitals of the elements of a cause of action." *Ocasio-Hernandez* v. *Fortuno-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)(quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)). I do not consider the likelihood of plaintiff's success on the merits. *Id.* If I am able to draw a reasonable inference that defendants are liable for the alleged misconduct, then the claim is plausible and I must deny the motion to dismiss. *Id.*

## III. SOVEREIGN IMMUNITY

Sovereign immunity under the Eleventh Amendment of the United States Constitution protects states from suit in federal court unless the state waives immunity. "The Eleventh Amendment prevents congressional authorization of suits by private parties against unconsenting states." *Seminole Tribe of Florida* v. *Florida*, 517 U.S. 44, 72 (1996). Sovereign immunity from suits authorized by federal law does not extend to municipalities, it extends "only to States and arms of the State." *Northern Ins. Co.* v. *Chatham County*, 547 U.S. 189, 193 (2006). Despite its municipal title, the Suffolk County Sheriff's Department, which

8

oversees the correctional facilities in Suffolk County, is controlled directly by the Commonwealth of Massachusetts and all employees of the Department are employees of the Commonwealth. Mass. St. 2009, c. 61, §§ 3, 13 (effective January 1, 2010)(transferring Barnstable, Bristol, Dukes, Nantucket, Norfolk, Plymouth, and Suffolk Sheriffs and their employees to the Commonwealth, ". . . all employees of the office of a transferred sheriff . . . are hereby transferred to that transferred sheriff as employees of the commonwealth."). Massachusetts Sheriff's Departments are therefore considered arms of the state and are entitled to sovereign immunity. *See Jeffrey Gallo, et al.* v. *Essex County Sheriff's Dept.*, 2011 WL 1155385 at *3 (D. Mass. March 24, 2011).

Greene has asserted federal and state law claims against Tomkins, Smith, and Nee in their official capacities as employees of the state. He does not contest that sovereign immunity bars official capacity claims against state officials for punitive and compensatory damages. Such claims, including those under RLUIPA, must be dismissed. *See Sossamon* v. *Texas*, 131 S.Ct. 1651, 1659 (2011) (noting that states do not waive sovereign immunity by accepting funding under RLUIPA).

Greene also, however, advances claims for prospective relief, including declaratory relief and an injunction. These types of claims survive the assertion of sovereign immunity

9

pursuant to *Ex Parte Young*, 209 U.S. 123 (1908).  Where a plaintiff seeks "prospective injunctive relief" rather than a retroactive award, the Eleventh Amendment does not present an obstacle.  *See Id.*, *Edelman* v. *Jordan*, 415 U.S. 651, 677 (1974).

The force of the Eleventh Amendment is even more potent when faced with state-law claims against state officials.  "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law."  *Pennhurst State School & Hosp.* v. *Halderman*, 465 U.S. 89, 106 (1984).  Thus, the prospective relief exceptions outlined in *Young* and *Edelman* do not apply to claims against state officials based on state law, such as those presented in Counts 5 and 6, to the extent they raise official capacity claims.  *Id.* (The doctrinal basis for *Young* and *Edelman* disappears where plaintiffs allege violations of state law because a "federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.")

## IV. PROSPECTIVE RELIEF UNDER FEDERAL LAW

I next consider whether injunctive or declaratory relief, the type of prospective relief permitted against states under *Young*, 209 U.S. 123, may be appropriate in this case.  Greene requests declaratory and injunctive relief in his Second Amended

10

Complaint, *c.f. Mitchell* v. *Massachusetts Dept. of Correction*, 190 F.Supp.2d 204 (D. Mass. 2002)(finding that *Young* does not apply because the plaintiff did not request prospective relief). While Greene properly has requested this relief, I must consider whether Greene's request for these forms of relief is moot.  The parties have not included any argument about mootness in their memoranda.

Greene states in his complaint that he has been in the custody of the Suffolk County Sheriff's Department from May 2011 to October 2012 and from February 2013 to the present.  Greene does not admit in his complaint that the violations of which he complains have ceased*.  C.f. Seaver* v. *Manduco*, 178 F.Supp.2d 30, 36 (D. Mass. 2002)(finding that injunctive relief would be inappropriate given plaintiff's admission that the violation was in the past and was not ongoing).  Instead, he alleges that the violations spanned his earlier and current periods of incarceration, that the violations happen "routinely," *id*. ¶ 1, and that the violations continue, *id.* ¶ 95, 101, 107, 112.

At oral argument on the motion to dismiss, I inquired whether Greene remained in custody, and his counsel informed me that he has been released.  While Greene's release is not documented in the complaint, the parties agree that he is not currently in the custody of the Department.  Based on undisputed representations from counsel, representations that could "be

accurately and readily determined from sources whose accuracy cannot reasonably be questioned" if there were any purported disagreement about the underlying facts, I take judicial notice of the fact that Greene is not currently in the custody of the Department. *See* Fed. R. Evid. 201.

Because Greene is no longer in the custody of the Department, the request for prospective relief is moot under governing First Circuit law. *See Ford* v. *Bender*, 768 F.3d 15, 29 (1st Cir. 2014)("A prisoner's challenge to prison conditions or policies is generally rendered moot by his transfer or release.")  Greene mentions in passing in his memorandum his entitlement to prospective relief because he is "subject to future incarceration by the Defendants," but he does not expand on this argument in the context of mootness.  This seems to be a reference to the general exception to the mootness doctrine for conduct that is capable of repetition yet evading review.  *Id.* at 30.  A future risk of reincarceration is typically not viewed as demonstrating a reasonable probability of recurrence.  *Id.* ("we generally have been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury")(quoting *Honig* v. *Doe*, 484 U.S. 305, 320 (1988)).  Greene has presented no other information from which I can conclude that there is a

reasonable probability of recurrence within the legal framework laid out by the First Circuit.[2]

## V. QUALIFIED IMMUNITY

Qualified immunity is an affirmative defense for which the defendants bear the burden of proof. *DiMarco-Zappa* v. *Cabanillas*, 238 F.3d 25, 35 (1st Cir. 2001). It limits government officials' exposure to liability for damages in their individual capacities, but does not shield them from prospective relief. *Ryder* v. *United States*, 515 U.S. 177, 185 (1995). The question whether qualified immunity is appropriate should be "resolved at the earliest possible stage in litigation," because it is designed to give government officials protection from the entire litigation process, not merely from liability, if immunity is appropriate. *Maldonado* v. *Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). At the motion to dismiss stage, any

---

[2] The defendants also argue that Greene is barred from suing the defendants in their official capacities because § 1983 claims lie only against "persons" and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will* v. *Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). While this argument provides an additional reason to dismiss the official capacity allegations for compensatory and punitive damages, it does not provide an additional reason to dismiss any claim for prospective relief. The Supreme Court in *Will* went on to clarify that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state." *Id.* at n. 10 (quoting *Kentucky* v. *Graham*, 473 U.S. 159, 167, n.14 (1985)).

assessment of qualified immunity requires me to evaluate the sufficiency of the defense on the face of the plaintiff's pleadings.  *Id.*

Qualified immunity requires a two-part inquiry: whether the allegations make out a constitutional violation, and whether the violated right was clearly established at the time of the offending conduct.  *Ford*, 768 F.3d at 23.  The "clearly established" inquiry, in turn, considers the clarity of the law at the time of the alleged violation and whether a reasonable defendant would understand that his or her conduct violated the plaintiff's constitutional rights.  *Id.*

Greene contends that, as a preliminary matter, the defendants have not established that their actions were in the scope of a "discretionary function."  Defendants cite two cases from Georgia federal district courts that note that the defendants had not shown that they were engaged in a discretionary function, and consequently could not invoke qualified immunity.  *See Street* v. *City of Bloomingdale*, 2007 WL 1752469, at *4 (S.D. Ga. June 15, 2007); *Reed* v. *Okereke*, 2006 WL 2444068, at *19 (N.D. Ga. Aug. 22, 2006).  The argument from the negative pregnant is that if that showing were made, qualified immunity may have been available.  While the Eleventh Circuit regularly analyzes in detail whether an official is acting within the official's discretionary authority as a

prerequisite to a qualified immunity analysis, *see, e.g., Lumley* v. *City of Dade City, Fla.*, 327 F.3d 1186 (11th Cir. 2003) ("To receive qualified immunity, the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred."), courts elsewhere, and in the First Circuit in particular, typically spend little time on this element.  The First Circuit has held that "[g]enerally, prison officials and officers are included in the category of those whose positions qualify them for such immunity."  *Brown* v. *Ponte*, 842 F.2d 16, 18 (1st Cir. 1988)(*per curiam*)(citing *Procunier* v. *Navarette,* 434 U.S. 555, 561(1978)).

Each of the defendants here was alleged by the plaintiff to be involved in making high-level determinations about the practices and policies of the Suffolk Department of Correction or Suffolk House of Correction and their misconduct is alleged to be the creation or implementation of an improper practice or policy.  Greene's efforts to undercut the claim of qualified immunity based on a non-discretionary function fails.

Defendants do not challenge in any particularized manner the conclusion that their conduct as alleged amounts to a constitutional violation. Even their conclusory language, "Defendants contend that the action they took in response to Plaintiff's numerous complaints, grievances and requests did not violate the Plaintiff's constitutional rights," seemingly misses

15

the point.  Greene's primary theory is that the Defendants are liable for creating and implementing the policies that led to his being deprived of calorically adequate kosher food and Jewish religious services, not that they themselves were directly involved in the violations or the remedial process. While Greene has an additional factual hook for his claims against Nee based on his filing a grievance to her directly, the focus of this action is not the response to Greene's complaints but rather the policies that he claims led to his being provided calorically inadequate kosher food and being denied access to religious services.

It is clearly established that a prisoner must have "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz* v. *Beto*, 405 U.S. 319, 322 (1972). Multiple federal and state laws provide protection for inmates' free exercise of their religion.  For example, RLUIPA prohibits prisons that receive federal funds from imposing a "substantial burden" and an inmate's religious exercise in the absence of the prison's demonstration that the imposition of such a burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  Massachusetts law similarly requires that "an inmate of any prison or other

place of confinement shall not be denied the free exercise of his religious belief and the liberty of worshipping God according to the dictates of his conscience in a place where he is confined."  Mass. Gen. Laws c. 127 § 88.

In addition to identifying general rights that touch on freedom of religious practice for inmates, I must consider whether the specific rights Greene alleges were violated were clearly established and "determine whether an alleged right was established with sufficient particularity that a reasonable official could anticipate that his actions would violate that right."  *Borucki* v. *Ryan*, 827 F.2d 836, 838 (1st Cir. 1987). Concerning the claim that the kosher food provided to Greene was calorically inadequate, the First Circuit noted in 2013, that "it has been held that 'a prisoner's religious dietary practice [will be found to be] substantially burdened when the prison forces him to choose between his religious practice and adequate nutrition.'"  *LeBaron* v. *Spencer*, 527 Fed.Appx. 25, 30 (1st Cir. 2013)(quoting *Nelson* v. *Miller*, 570 F.3d 868, 879 (7th Cir. 2009).[3]

_____

[3] There may be a stronger argument that the claims related to cruel and unusual punishment are not based on clearly established rights given uncertainty in the law about whether caloric deprivation related to religious observance is the same as caloric deprivation generally, the latter being a clear Eighth Amendment violation, *Farmer* v. *Brennan*, 511 U.S. 825, 832-33 (1994).  *Compare Campbell* v. *Cornell Corr. of Rhode Island, Inc.*, 564 F. Supp. 2d 99, 102-03 (D.R.I. 2008)(holding

Rights of inmates are evaluated while considering the burden on the prison and giving "due deference to the experience and expertise of prison and jail administrators."  *Spratt* v. *Rhode Island Dept. of Corrections*, 482 F.3d 33, 39 (1st Cir. 2007)(quoting *Cutter* v. *Wilkinson*, 544 U.S. 709, 717 (2005)). On the face of the pleadings as they stand now, the defendants have not argued or made a showing that the rights that Greene claims were violated were not clearly established.  Of course as the case moves forward, additional facts about the scope and nature of the alleged violations could lead to a different conclusion.

Defendants next argue that even if the rights were clearly established, the action they took in response to Greene's complaints and requests did not violate Greene's constitutional

---

that a claim that an inmate was denied food that was consistent with his religious belief was distinct from a claim of inadequate quantity of food or inadequate nutritional value and therefore does not state a claim under the Eighth Amendment) *with Hall* v. *Sutton*, 2012 WL 407244 (S.D. Ill. Feb. 8, 2012)(holding that a claim that a Muslim inmate was only provided with 1000 calories worth of food before sunrise and after sunset during Ramadan could be sufficient to satisfy the objective prong of the Eighth Amendment, drawing no distinction between deprivation of calories generally and those based on religious observance) *and with Florer* v. *Bales-Johnson*, 752 F.Supp.2d 1185, 1200 (W.D. Wash. 2010) aff'd 473 F. App'x 651 (9th Cir. 2012)(Eighth amendment requires nutrition adequate to maintain health, Kosher menu need not meet USDA nutritional guidelines as those recommendations are not constitutional requirements on their own, drawing no distinction between nutritional deprivation for purposes of religious observance and for other reasons).

rights.  They do not provide any support for this argument, however, other than their claims that Greene does not allege that they (other than defendant Nee) were aware of the violations, and that any response was reasonable.  While Nee is the only defendant that Greene claims was directly aware of at least some of the violations, this action is not predicated on a theory that the defendants were actually aware that Greene in particular was being deprived of kosher food, sufficient caloric intake, and religious materials and services.  Instead, Greene alleges that each of the defendants was aware of and implemented policies and practices that they knew or should have known led to Jewish inmates being denied calorically adequate kosher food and access to religious services.  The policies and practices are what Greene claims to be the defendants' violations here, not their roles in his own deprivation.

As for defendant Nee, Greene has alleged that she did not in any way remedy the violation of which he complained.  Greene therefore adequately alleges knowledge, individualized for Nee and based on policies and practices for all of the defendants, that could be the foundation for a finding of a constitutional violation, and the complaint does not provide any grounds for the defendants' arguments that their responses to the existence of a violative policy or to Greene's individual situation were reasonable.

Aside from challenging the lack of knowledge, defendants also attempt to argue that at the motion to dismiss stage I can assume that the only alleged violations occurred during the six-day period in June 2012 plus on the one occasion in April 2013 that Greene filed formal grievances and that I must assume that on the other dates the food and access to religious services was not a problem.  They further argue that I must assume that the responses to the grievances were satisfactory because Greene did not file follow-up grievances.  These arguments neglect the essential fact that at the motion to dismiss stage, I must "accept the well-pleaded facts in the operative complaint as true, construing them in the light most favorable to . . . the nonmoving party."  *Lydon* v. *Local 103, Intern. Broth. Of Elec. Workers*, 770 F.3d 48, 50 (1st Cir. 2014).  I accept Greene's allegations as true and view them in the light most favorable to him.  Consequently, contrary to the defendants' arguments here, I must accept that "[i]n the two meals a day that [the Department] does provide, the Department regularly fails to comply with Kosher requirements," Compl. ¶ 24, and other allegations by Greene that the violations were regular and ongoing.  The lack of additional grievances does not indicate that the grievances were resolved.

At this stage, taking the plaintiff's well-pled allegations as true, I find that constitutional violations have been alleged adequately and the violations alleged are clearly established.

## VI. RLUIPA AND INDIVIDUAL CAPACITY CLAIMS

The Department contends that RLUIPA applies only to defendants acting in their official capacities, and because sovereign immunity bars such claims, as discussed above, there is no viable RLUIPA claim against defendants. The First Circuit has not addressed the issue whether RLUIPA can reach actions against individuals acting in their individual, rather than official, capacities. The Third, Fourth, Fifth, Seventh, Tenth, and Eleventh Circuits, however, have taken the view that FLUIPA does not allow for personal capacity claims for monetary damages. *See, e.g., Sharp* v. *Johnson*, 669 F.3d 144, 154 (3d Cir. 2012) (collecting cases from other circuits sharing this view).

Greene does not contest this argument, and in fact his RLUIPA claims in the complaint are directed only against defendants Tompkins, Smith and Nee in their official capacities. He seeks only prospective relief under this count. Compl. ¶ 84. Therefore, I note that while the RLUIPA claims would not be dismissed on this ground because claims for official capacity prospective relief survive the sovereign immunity challenge, the

RLUIPA claims must be dismissed because the prospective relief requested in this case is moot, *see* Section IV *supra*.

### VII. INDIVIDUAL CAPACITY CLAIMS

The individual capacity claims that Greene asserts against Cabral, Tompkins, Horgan, Smith, and Nee require that each of the defendants be held liable on the basis of that defendant's own actions. *See Leavitt* v. *Correctional Medical Services, Ind.*, 645 F.3d 484, 502 (1st Cir. 2011). A defendant may not be held individually liable on a *respondeat superior* or other supervisory theory alone; rather, the plaintiff must show that the defendant had a direct connection to the misconduct. "In a § 1983 suit or a *Bivens* action — where masters do not answer for the torts of their servants — the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677.

For a supervisor to be held liable for a supervisee's conduct, liability must be premised on the supervisor's "own acts or omissions." *Whitfield* v. *Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). This does not require direct involvement in misconduct, but it does require an "affirmative link" between the supervisor's actions and the alleged violation. "Absent direct participation, a supervisor may only be held liable where (1) the behavior of [his] subordinates results in a

constitutional violation and (2) the [supervisor's] action or inaction was '*affirmatively link[ed]*' to the behavior in the sense that it could be characterized as 'supervisory encouragement, condonation or acquiescence' or 'gross negligence . . . amounting to deliberate indifference.'" *Id.* (quoting *Hegarty* v. *Somerset County*, 53 F.3d 1367, 1379-80 (1st Cir. 1995)).

Liability may be appropriate under limited circumstances where the training and supervision of employees led to a civil rights deprivation even if a supervisor was not directly involved in or even aware of a specific violation.  Liability is appropriate in such circumstances only where a supervisor shows "deliberate indifference" to the "possibility that deficient performance of the task eventually may contribute to a civil rights deprivation." *Camilo-Robles* v. *Zapata*, 175 F.3d 41, 44 (1st Cir. 1999).  Deliberate indifference requires that "a prison official subjectively must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Burrell* v. *Hampshire County*, 307 F.3d 1, 7 (1st Cir. 2002). Supervisory liability under a theory of deliberate indifference can be found "only if it would be manifest to any reasonable official that his conduct was very likely to violate an individual's constitutional rights." *Maldonado*, 568 F.3d at

275.  Prison officials "cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided."  *Burrell*, 307 F.3d at 7.

Defendants argue that Greene has failed adequately to allege facts in his complaint to make out a claim of deliberate indifference, noting what they claim are insufficient allegations concerning notice and active involvement by each of the defendants.  This argument, however, appears to rest on the defendants' misunderstanding of Greene's allegations.  Greene does not allege that the defendants themselves were directly involved in the claimed violations; instead, he roots his claims against the defendants in allegations that each was involved in creating and implementing the policies and practices at the Department and the HOC and that each knew or should have known that the policies and practices concerning food and religious services for Jewish inmates were unlawful.  In these circumstances, Greene need not allege that the defendants knew of or participated in the particular deprivations of which Greene complains, because a supervisor, "removed from the perpetration of the rights-violating behavior [] may be liable under section 1983 if he formulates a policy or engages in a practice that leads to a civil rights violation committed by another."  *Camilo-Robles*, 151 F.3d at 7.

24

The fact that each of the defendants had supervisory roles and were involved in policies and programming would be insufficient to support supervisory liability in this case if the alleged violations were committed by other officers in violation of the policies and programs because there is no allegation that the defendants (other than perhaps Nee) were aware of any deviation from policy or practice.  Here, however, Greene alleges that the misconduct occurred in compliance with the practice, policy, and programs implemented by the defendants.  This language is clearest in relation to Superintendent Horgan, because Greene claims that Horgan was aware that the deprivations of calorically adequate kosher food and access to religious programming occurred "by Department policy and practice."  Compl. ¶ 89.  For all defendants, however, Greene makes the general allegation it is the "Defendants' implementation and oversight of policies that deprived Mr. Greene . . . of sufficient caloric intake."  *Id.* ¶ 103.  *See also id.* ¶ 112 (noting that the subordinates are enforcing policies when they force Greene to go without food or abandon his sincerely held religious beliefs).  At other times, however, Greene appears to claim in more general terms that the defendants' involvement in the highest levels of policy and program decisions for the Department and the HOC meant that they knew or should have known of other violations occurring under

their watch.  These latter allegations are not enough on their own, but other allegations connecting the violations to the policies and programs created and enforced by the defendants are sufficient to make out a claim for supervisory liability.

A supervisor is liable only when he or she demonstrates deliberate indifference.  Greene alleges facts that could make out deliberate indifference.  Deliberate indifference requires knowledge of facts from which an official could draw an inference that a substantial risk of serious harm exists. *Ramirez-Lluveras* v. *Rivera-Merced*, 759 F.3d 10, 20 (1st Cir. 2014).  In the complaint, Greene claims significant weight loss and other medical and psychological consequences, which could fairly make out a grave risk of harm from caloric deprivation, and he claims that defendants knew of the policies and practices because they actually created and enforced them.

The question remains, however, whether alleging unnamed policies and practices that violated Greene's rights is too conclusory an allegation to survive a motion to dismiss. Allegations that are conclusory are not entitled to an assumption of truth.  *Iqbal*, 556 U.S. at 681.  In *Sanchez* v. *Pereira-Castillo*, 590 F.3d 31 (1st Cir. 2009), the First Circuit rejected claims against administrative defendants in a case where officers pressured an inmate to receive unnecessary exploratory surgery to search for contraband.  The court upheld

claims against officers directly involved, but dismissed a
§ 1983 supervisory liability claim pursuant to *Iqbal* against
higher-up administrative defendants, finding that the complaint
merely "[p]arrot[ed] our standard for supervisory liability in
the context of Section 1983 . . . [alleging] that the
administrative defendants were 'responsible for ensuring that
the correctional officers under their command followed practices
and procedures [that] would respect the rights and ensure the
bodily integrity of Plaintiff' and that 'they failed to do [so]
with deliberate indifference and/or reckless disregard of
Plaintiff's federally protected rights.'" *Id.* at 49.  The Court
held that language to be conclusory and that it should not be
given credence.  *Id.*  The sole claim in *Sanchez* that was more
specific was that one of the officers who was directly involved
and was particularly pushy toward medical staff was following
directives and regulations designed and implemented by the
administrative defendants.  *Id.*  The only regulations described
in the complaint were a strip search and x-ray regulation, and
the court held that the claim that the surgery resulted from
those policies was implausible.  *Id.* at 49-50.

Here, Greene does not specify the policies, programs, and
practices that the defendants implemented and oversaw.  He does,
however, claim not only that the policies and programs permitted
the violations to occur but that the violations occurred through

compliance with those policies and programs.  The First Circuit
rejected the allegations in *Sanchez* based on the implausible fit
between the named policies and the harm that resulted, not based
on the fact that a supervisor is not properly held accountable
under § 1983 where an employee commits a violation acting
pursuant to a directive or regulation created and implemented by
supervisors.  Here, given the absence of a specifically
identified policy or program that led to the violations, I do
not have the information necessary to measure the fit between
the policy or program alleged and the violations.

At this very early stage in the case, I conclude that it
would be improvident for me to dismiss the complaint based on
the fact that Greene has not specified the policy.  The general
theory of supervisory liability based on unlawful policies and
practices created and enforced by supervisory defendants is a
valid one that states a claim for relief.  Unlike in *Sanchez*,
there is no reason apparent on the face of the complaint to
discount the connection alleged by Greene between the policies
and the alleged violations of his rights.

Nonetheless, Greene's failure to name the specific policies
and practices that underlay his claims make the allegations
border precariously on the conclusory.  I therefore conclude
that the proper course of action in this case is to move this

case as efficiently as possible to summary judgment.  A schedule for doing so will be outlined below.

## VIII. MASSACHUSETTS CIVIL RIGHTS ACT

The allegations against the defendants under the Massachusetts Civil Rights Act, Mass. Gen. Laws c. 12 § 11H & I, in their official capacities are barred by sovereign immunity, as discussed above, *see* Section III *supra,* and are excluded by the statute itself since the Commonwealth is not a "person" within the meaning of the MCRA.  *See Kelley* v. *LaForce*, 288 F.3d 1, 11 n.9 (1st Cir. 2002).  The claims for prospective relief are subject to dismissal as moot.  *See* Section IV *supra.*

## IX. CONCLUSION

For the reasons set forth more fully above, it is hereby ORDERED that Defendants' Motion to Dismiss is GRANTED in part and DENIED in part, in that:

1.  All claims for prospective relief are dismissed as moot;

2.  Official capacity claims for damages under federal law in Counts I, II, III, and IV, are hereby dismissed; and

3.  Official capacity claims for damages under state law in Counts V and VI are hereby dismissed.

Defendants are ordered to file a motion for summary judgment by September 11, 2015.  Plaintiff's response may include an affidavit or declaration detailing any discovery necessary to respond to the motion for summary judgment, *see*

Fed. R. Civ. P. 56(d), but should in any event respond to defendants' motion for summary judgment on the merits.


_/s/ Douglas P. Woodlock_
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE