UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TIMOTHY GREENE,                    )
                                   )
          Plaintiff,               )
                                   )    CIVIL ACTION NO.
     v.                            )    12-11685-DPW
                                   )
ANDREA CABRAL, ET AL.,             )
                                   )
          Defendants.              )

MEMORANDUM AND ORDER
June 15, 2018

Plaintiff Timothy Greene, who practices as an Orthodox Jew, was twice incarcerated in the Suffolk County House of Correction.  In this lawsuit, he asserts that his religious liberties were violated while incarcerated.  He claims that he was not properly served sufficient kosher food and that he was denied the ability to participate in religious services led by a rabbi.

## I. PROCEDURAL BACKGROUND

Greene filed this action *pro se*.  After becoming represented by counsel, he amended his complaint twice, refining his claims and dismissing the Suffolk County Sheriff's Department as a defendant.  In the operative Second Amended Complaint, Greene asserts six sets of claims: one for violations of the Religious Land Use and Institutionalized Persons Act (RLUIPA); three claims under 42 U.S.C. § 1983 — for violations

of his right to freedom of religion under the First and Fourteenth Amendments, his right to equal protection under the Fourteenth Amendment, and his right to be free of cruel and unusual punishment under the Eighth Amendment; and two under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I — for parallel religious freedom and cruel and unusual punishment claims.

Defendants moved to dismiss these claims. In an earlier Memorandum and Order of July 13, 2015, *Greene* v. *Cabral*, No. 12-cv-11685-DPW, 2015 WL 4270173 (D. Mass. July 13, 2015), I dismissed Plaintiff's RLUIPA claim, all claims against Defendants in their official capacities, and all claims for prospective relief. However, I rejected Defendants' assertion of qualified immunity at that stage and allowed the § 1983 and state claims against Defendants in their individual capacities to proceed to summary judgment.

To allow for the more efficient segmentation of discovery, summary judgment practice has taken place in two phases. After Defendants deposed Plaintiff, but before Plaintiff conducted his own fact discovery, I allowed summary judgment motions where additional discovery was not necessary or clearly would be fruitless. At a hearing on January 6, 2016, I granted summary judgment for Defendants on all claims relating to cruel and unusual punishment under federal and state law because those

claims were not clearly established and qualified immunity
therefore protected them from suit.  I granted summary judgment
for all claims arising out of the availability of a Torah in the
prison library and for all claims arising out of isolated
instances in which Plaintiff was incorrectly provided a non-
kosher meal because Plaintiff failed to meet his burden of
showing that Defendants possessed the deliberate indifference
necessary for supervisory liability under § 1983.  Finally, I
granted summary judgment on claims based on allegations that
Defendants used non-kosher ingredients in ostensibly kosher
meals because the clear and ultimately uncontested evidence
established that all ingredients used were in fact kosher.[1]

At the same hearing, I allowed discovery to proceed on
Plaintiff's claims concerning the availability of religious
services and issues of contamination of kosher food in the
preparation and serving processes.  Defendants seek summary
judgment on those remaining issues in the case.  In addition to
opposing Defendants' summary judgment motion, Plaintiff has also

---

[1] In his opposition to summary judgment, Plaintiff now raises the
somewhat independent issue whether Defendants properly prepared
meals that were kosher for Passover.  The dietary restrictions
required on that holiday are separate from and additional to the
daily obligations of kashrut.  However, issues related to
Passover are not mentioned in the operative complaint and were
not subject to Plaintiff's internal administrative grievances.
Cf. 42 U.S.C. § 1997e(a) (administrative remedies must be
exhausted before prison condition litigation can be brought).  I
find these issues to be outside the scope of this litigation.

moved to strike the expert testimony of Rabbi Michael Rosenberg
submitted by Defendants in support of summary judgment.  I will
address the motion to strike before addressing the summary
judgment motion.

## II. MOTION TO STRIKE

Plaintiff moves to strike evidence provided by Defendants'
expert witness, Rabbi Rosenberg, as untimely disclosed.  At the
January 6, 2016 hearing, I set the following schedule for this
case.  "On remaining claims, discovery to be completed by April
8.  Summary judgment motions due April 29, opposition by May 20,
reply briefs June 3, and argument on June 29 at 3:00."  I did
not specifically discuss expert discovery at that hearing.
Rosenberg was retained as an expert on March 16, 2016, inspected
the House of Correction kitchen on April 15, 2016, and provided
his affidavit and report to Defendants on April 28, 2016.
Defendants attached the report to their motion for summary
judgment on April 29, 2016.

Under Federal Rule of Civil Procedure 26(a)(2)(A)-(B),
parties must disclose the identity of an expert witness and his
written report.  "Absent a stipulation or court order," that
disclosure must be made at least 90 days prior to trial.  Fed.
R. Civ. P. 26(a)(2)(D).  Local Rule 26.4 modifies this timeline,
requiring expert disclosures to be made 90 days prior to the
final pretrial conference.  No date has been set for a final

pretrial conference.  Accordingly, the expert disclosure in this case would presumably be timely under the default Local Rule. However, if the deadline set for discovery encompasses expert witness disclosures, as Plaintiff contends, then the disclosures were untimely.

My prior order setting a deadline for discovery included expert discovery.  Any other interpretation would — as Defendants should have understood — undermine the basic purpose of expert discovery.  Here, the introduction of expert testimony along with a summary judgment motion – with no notice to Plaintiff beforehand – "deprived [plaintiff] of the opportunity to depose the proposed expert, challenge his credentials, solicit expert opinions of its own, or conduct expert-related discovery."  *Lohnes* v. *Level 3 Commc'ns, Inc*., 272 F.3d 49, 60 (1st Cir. 2001).  "This is exactly the type of unfair tactical advantage that the disclosure rules were designed to eradicate." *Id.*  Sanction under Rule 37(c)(1), which ordinarily takes the form of mandatory preclusion, is consequently appropriate.  *Id.*

That said, there is "a narrow escape hatch that allows the court to admit belatedly proffered expert evidence if the proponent's failure to reveal it was either substantially justified or harmless."  *Id.*  The latter prong applies here.  As the subsequent discussion will make evident, the Rosenberg testimony is not determinative of the outcome on summary

5

judgment.  His report provides somewhat useful general context
for Orthodox Jewish law and practice, and I treat it as part of
the record for that limited purpose, but the outcome would be
the same without it.  Even so, the late disclosure
inappropriately offered an avenue for minor tactical benefits to
Defendants and considerable diversion of resources required for
Plaintiff's counsel to prepare the motion to strike and for the
court to address it.  As an alternative sanction authorized by
Rule 37(c)(1)(A), I will, without engaging in further motion
practice on the matter, award Plaintiff reasonable expenses
which I am able reliably to calculate without further factual
development in this context as $2,000, including attorneys'
fees, caused by Defendants' untimely disclosure.

### III. FACTUAL BACKGROUND

Greene has been incarcerated both at the Suffolk County
House of Correction and the Nashua Street Jail.  Greene claims
that his rights were violated at the House of Correction only,
and not the Jail, although both were operated by the Suffolk
County Sheriff's Department.

While incarcerated, Greene considered himself to have
converted to Orthodox Judaism, identified himself as such to
prison officials and followed Jewish law, although he had not
completed the arduous process of formal conversion to Judaism.
In particular, Greene followed the dietary laws of kashrut,

which required him to eat meals that were kosher in their ingredients, composition, and preparation.

## A.   *Kosher Meals*

Greene contends that he was not fed sufficient kosher food. Upon entering the House of Correction during each of his periods of incarceration, he requested kosher meals consistent with his religious observance, was approved to receive them, and generally did.  By official policy, the House of Correction served kosher meals according to planned menus and procedures developed in conjunction with Trinity Services Group.  According to this plan, prepackaged kosher entrees were served at lunch and dinner, while breakfast and side dishes were to be prepared by kitchen staff using proper kosher products and preparation. The system was intended to provide adequate nutrition and had been approved by Rabbi Ari Shapiro as compliant with Jewish law. Defendants have adduced as evidence labels showing that the ingredients used in the kosher meals were certified as kosher.

To demonstrate that kosher food was prepared with the proper techniques, Defendants rely on the affidavit and deposition testimony of the head chef of the House of Correction, Dominic Bartholomew, on written policies and on the expert report of Rabbi Michael Rosenberg.  According to Defendants, kosher food is prepared before other food, in order to prevent cross-contamination.  Designated utensils and

cookware are used. Kosher food is then wrapped in plastic wrap for protection until it is served. Since some time in 2012, kosher meals have been served on disposable Styrofoam trays; prior to then, they were served on gray trays used for all special meals, with individual wrappers separating the food from the tray itself. For this litigation, Defendants retained Rabbi Rosenberg to inspect the HOC kitchen; he opined that the systems in place were sufficient to ensure that the kosher meals complied with all the requirements of Orthodox Jewish law.

Greene does not disagree that the system as described complies in principle with Jewish law. He contends, however, that the system did not in fact provide him with adequate kosher food. He believes that only the prepackaged lunch and dinner entrees were, in fact, truly kosher. Eating only those two entrees would not provide adequate daily nutrition. Greene contends that at breakfast, he was served the same food provided to all inmates, served with the same utensils and on the same trays. If true, Greene's meals could have been contaminated by non-kosher food that touched the same trays and utensils. Greene further contends that the special trays and utensils designated for kosher diets were not, in fact, kosher. He affirmed that no individual wrappers separated the kosher food from the gray diet trays, meaning contamination from other non-kosher special diet food was possible. Chef Bartholomew

testified that special diet food was cooked using special, smaller pots and ladles — which could not be confused with the large items used for the general meal — and that religious diets were prepared before other special diets; Greene suggests that halal food might have been cooked in those pots before kosher food, causing contamination

## B.    *Religious Services*

Greene's complaints about his access to Jewish religious services have two dimensions, although Greene himself does not draw the relevant distinction.  First, he has sought access to formal, communal Jewish religious services – and specifically sabbath services — while in prison.  The prison does not hold weekly Jewish services.  Second, and less explicitly, he has sought counseling from a rabbi.  Both Greene's original grievance and his complaint focus on "services" but also discuss the availability of a rabbi, without clearly distinguishing the two.[2]  The House of Correction does not have a rabbi on staff and does not offer weekly Jewish services.

A full communal sabbath service, under Orthodox Jewish law, requires a minyan: a quorum of ten adult Jewish men.  As of June

---

[2] Defendants claim that access to a rabbi was not grieved by Greene and is not a subject of this lawsuit.  However, the operative complaint includes a paragraph describing Greene's request for access to a rabbi and attaches a grievance in which he describes himself as not able "to facilitate a spiritual councilor on my own."

16, 2016, there were six inmates at the House of Correction who identified as Jewish, including Greene, and one at the Nashua Street Jail. Not all of these inmates necessarily could have counted towards a minyan, even if they chose to attend services; Greene, who had not formally converted, for example, would not have counted under Orthodox law. At other points, however, there may have been larger numbers of Jewish inmates under the custody of defendants. In total, 12 inmates at the House of Correction during 2012 identified as Jewish and 15 did so during 2013. At the Nashua Street Jail, 28 inmates identified as Jewish over the course of 2012 and 24 did so during 2013.

The lack of a minyan posed an immediate obstacle to Greene's request for Jewish services. Defendant Anne Nee, the Director of Social Services charged with overseeing religious services at the House of Correction, in response to Greene's request, contacted an Orthodox rabbi, but that Rabbi informed her that he could not conduct a communal service without a minyan. There is no indication in the record of an attempt to overcome this obstacle either by combining the Jewish populations of different Suffolk County correctional facilities for prayer services or by bringing in sufficient volunteers to form a minyan.

Some forms of group prayer are permissible without a minyan. A minyan is required only for certain important prayers

and practices, such as saying the Kaddish and reading Torah. *See Hernandez* v. *C.I.R.*, 490 U.S. 680, 711 (1989) ("certain worship services cannot be performed and Scripture cannot be read publicly without the presence of at least 10 men." (citing 12 Encyclopaedia Judaica, Minyan, p. 68 (1972)); *LeBlanc-Sternberg* v. *Fletcher*, 67 F.3d 412, 417 (2d Cir. 1995) ("the saying of certain prayers and the reading from the Torah on the Sabbath require the presence of a 'minyan'"). Nevertheless, some Jews find spiritual value in praying together, even if they may only recite those individual prayers that do not require a minyan.

The record reflects that services without a minyan have been held in the House of Correction and that Greene has joined in such services. Greene has averred, for example, that in 2016 he attended a Passover Seder at the House of Correction with a rabbi and other inmates, but without a minyan. Additionally, on August 7, 2012, Nee scheduled a Jewish service led by a visiting rabbi, Yossi Stern, for Greene and three other Jewish inmates. The record does not reflect whether Stern brought other Jews with him to form a minyan or whether the group prayed together without a minyan. Additionally, Greene professes that while individual prayer is permissible under Judaism, group prayer is preferred.

Defendants claim to have offered Greene the option of a
non-denominational service as an opportunity for spiritual
reflection.  Greene contests the availability of such a service.
He testified that he was not aware of any non-denominational
service being offered during the relevant periods of
incarceration and points to a Departmental Program Guide listing
religious services and programming, which does not mention any
non-denominational services.  He states in his affidavit he
attended a "non-denominational" service and found it to be
Christian in nature, involving New Testament readings and
Communion.

Greene also was unable to meet with a rabbi during the
relevant periods of incarceration at the House of Correction.
After filing his grievances, a caseworker asked whether Greene
would be interested in having a rabbi visit him.  He responded
that he would be interested in a rabbinic visit, but remained
interested in sabbath services as well.  Nee then reached out to
two rabbis on Greene's behalf.  The first, Rabbi Halpern, was
Orthodox and declined to visit because Greene was not formally
converted to Judaism.  The second, Rabbi Schatzberg, was willing
to meet with Greene but ultimately was unable to do so for
personal reasons.  No additional efforts were apparently made to
find Greene a rabbi.

Other rabbis have visited inmates in the House of
Corrections, not including rabbis with whom inmates had a prior
personal connection.  In November 2013, two Jewish inmates
requested to meet with a rabbi.  Nee contacted Rabbi Dan Judson
of Hebrew College, who referred her to a rabbinical student,
Moshe Givental, who met and prayed with the two inmates.  In the
summers of 2012 and 2013, rabbinical students Reuven Eliezer
Overlander and Menachem M. Yaffee performed a prayer service
with inmates.  At other points from 2007 to the present, Rabbis
Rachelle Schoenfeld, Benjamin Shalva, and Ari Lev Fornari met
with Jewish inmates.  Greene also testified that he was able to
meet with a rabbi at the Nashua Street Jail, where the rabbi was
a regular volunteer.

## IV. STANDARD OF REVIEW

 The party moving for summary judgment bears the burden of
demonstrating the absence of a genuine issue of material fact
and showing that it is entitled to judgment as a matter of law.
Fed. R. Civ. P. 56(a).  In determining whether a genuine issue
of material fact exists, all reasonable inferences should be
drawn in the non-movant's favor.  *Vineberg* v. *Bissonnette*, 548
F.3d 50, 56 (1st Cir. 2008).  Where the non-movant bears the
ultimate burden of proof at trial, as here, he must also present
enough "definite, competent evidence to rebut the motion,"
without relying on "conclusory allegations, improbable

inferences, and unsupported speculation," to rebut the motion

for summary judgment. *Id.* (citations omitted).[3]

### V. ANALYSIS

Although all Defendants assert a qualified immunity

defense, I address first the question of supervisory liability

asserted by some Defendants before turning to the remaining

issues of qualified immunity.[4]

### A. *Supervisory Liability – Deliberate Indifference*

Greene has only alleged that one Defendant, Anne Nee,

directly violated his constitutional rights (Nee was responsible

for the relevant decisions concerning religious services and

access to a rabbi). For all of the other Defendants except Nee,

Plaintiff proceeds under a theory of supervisory liability,

asserting, for example, that Defendants were "ultimately

responsible for and control[led] the care and custody of the

---

[3] Plaintiff in his current submissions seems to request
additional discovery under FRCP 56(d), specifically related to
the number of other Jewish inmates in his unit. It appears that
this discovery has been conducted and is in the record, and that
this current request was inadvertently not removed from the
previous round of summary judgment briefs (it is word-for-word
identical). In any event, any further discovery on this point
would not be material.
[4] I note that in cases alleging supervisory liability and
deliberate indifference, the qualified immunity analysis
essentially merges into the deliberate indifference analysis.
*See Doe* v. *Fournier*, 851 F. Supp. 2d 207, 222 n.8 (D. Mass.
2012) (citing *Camilo–Robles* v. *Zapata*, 175 F.3d 41, 44 (1st Cir.
1999)).

inmates" or approved the House of Correction policies concerning religious diets and services.

Supervisory liability exists under § 1983, although only for an official's "own acts or omissions" and not under *respondeat superior* or other theories of vicarious liability. *Whitfield* v. *Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005). The supervisor's behavior must be "affirmatively linked" to the constitutional violations of her subordinates, such that it could be deemed "supervisory encouragement, condonation or acquiescence, or gross negligence . . . amounting to deliberate indifference." *Id.* (internal quotations omitted).

Greene did not allege that Defendants directly encouraged or acquiesced in any violations of his rights – and to the extent that he did, such allegations did not survive the motion to dismiss — but rather has proceeded on a theory of deliberate indifference. In the First Circuit, a plaintiff must establish deliberate indifference by showing "(1) that the officials had knowledge of facts, from which (2) the official[s] can draw the inference (3) that a substantial risk of serious harm exists." *Ramirez-Lluveras* v. *Rivera-Merced*, 759 F.3d 10, 20 (1st Cir. 2014) (internal citations and quotations omitted). Plaintiff's theory is that Defendants were deliberately indifferent to his rights because they formulated or implemented the House of Correction policies which Defendants should have understood

would lead to Plaintiff's serious injuries (both physical, such as weight loss, and intangible, such as the ability to worship).

Plaintiff does not muster evidence sufficient to show deliberate indifference by the named supervisory Defendants. First, he points to the supervisory Defendants' role in creating and approving the House of Corrections policies governing religious diets and religious services. However, these policies cannot be found to have caused the deprivations of Greene's religious liberty.

The policy on religious diets requires special diets to be provided to those whose religious beliefs require them. The kitchen contractor, Trinity Services Group, provides a more detailed plan for providing kosher food which provides for the use of separate utensils and the prevention of cross-contamination.

The policy on religious services provides that when a religious leader of an inmate's faith is not regularly available as staff or a volunteer, "the Department chaplain shall endeavor to assist the inmate in contacting a religious leader of the inmate's faith." It allows for requests for individual counseling sessions to be made through the caseworker staff or to the Supervisor of Volunteer and Religious Services.

Greene's allegations concern non-compliance with these policies. The supervisory Defendants would have no reason to be

aware of a risk of harm from these policies alone; the policies appear designed to protect against the very harms Greene claims to have suffered. Nothing approved by them, for example, allows for kitchen trays to touch both kosher and non-kosher food, or authorizes staff to make only limited attempts to secure access to a rabbi.

The same circumstances are applicable with respect to Plaintiff's allegations of failure to train kitchen staff properly on how to prepare kosher meals. "A finding of deliberate indifference requires also that the City have disregarded a known or obvious risk of serious harm from its failure to develop a training program . . . ." *Young* v. *City of Providence ex rel. Napolitano*, 404 F.3d 4, 28 (1st Cir. 2005). There is no evidence of any sort of notice to the supervisory Defendants of shortcomings in the training regimen and therefore can be no finding of deliberate indifference.

Next, Plaintiff argues that certain Defendants who needed to approve particular religious services, such as the admission of a rabbi to meet with an inmate, should have realized that no such services were being provided. However, there is no record evidence suggesting these Defendants knew that Plaintiff had sought, for example, to meet with a rabbi, so there is no way to infer that they knew Plaintiff was being denied the opportunity to meet with a rabbi.

Plaintiff's remaining argument, that "Defendants have an oversight obligation in their roles" and "had the responsibility of supervising the operations of the jail," represents a statement at a high level of generality and underscores what the limits on supervisory liability under § 1983 are meant to cabin. Greene cannot first impute to Defendants knowledge about all prison conditions and then infer deliberate indifference from that knowledge. Conclusory invocations of training obligations do not strengthen Plaintiff's argument in this respect. No affirmative link has been put forward connecting the supervisory Defendants to Greene's alleged constitutional deprivations. Summary judgment is therefore granted for all claims against Defendants Cabral, Tompkins, Horgan, and Smith.

## B. *Qualified Immunity*

The non-supervisory Defendant, Nee, has asserted a qualified immunity defense with regard to the religious services claims made against her. "An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct." *Plumhoff* v. *Rickard*, 134 S. Ct. 2012, 2023 (2014). "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law."

*Taylor* v. *Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 743 (2011)).

Courts have discretion in how to sequence their qualified immunity decisions. In the interest of developing a clarified body of constitutional law, a court might first determine whether a constitutional violation exists and then ask whether the right was clearly established. Alternatively, a court may begin instead with the qualified immunity inquiry to engage efficiently with the issue. The Supreme Court has instructed courts to "think hard, and then think hard again" before taking the former approach. *Camreta* v. *Greene*, 131 S. Ct. 2020, 2032 (2011). I begin the inquiry in this case, by asking whether the rights in question were clearly established.

For a right to have been clearly established, such that qualified immunity does not shield an official from liability, "the right's contours [must have been] sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."[5] *Plumhoff*, 134 S. Ct. at

---

[5] Defendants misstate the standard for qualified immunity, claiming that whenever "the actions taken were reasonable," an official is shielded. The reasonableness inquiry is not directed to determining whether the official's actions were reasonable – although that may be an element of whether an official acted unconstitutionally – but rather whether an official reasonably believed that his actions were lawful. *See, e.g., Anderson* v. *Creighton*, 483 U.S. 635, 641 (1987) ("those officials — like other officials who act in ways they reasonably believe to be lawful — should not be held personally liable").

2023.  First, this means that the court must focus on the clarity of the law at the time of the alleged civil rights violation.  *Maldonado* v. *Fontanes,* 568 F.3d 263, 269 (1st Cir. 2009).  Judicial precedent must have placed the legal question "beyond debate" at a level of specificity sufficient for the official to be capable of applying it to their circumstances.  *Plumhoff*, 134 S. Ct. at 2023.  Second, the court must focus more concretely on the facts of the particular case and determine whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights.  *Maldonado*, 568 F.3d at 269.

Most of Plaintiff's claims involve clearly established rights at some level of generality.  The Supreme Court has long held that a prisoner must have "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts."  *Cruz* v. *Beto*, 405 U.S. 319, 322 (1972) (per curiam).  Greene's specific rights of access to adequate kosher meals and to religious services are also well-established at this level of generality.

As to meals, the First Circuit has explicitly held that

---

The reasonableness of Defendants' actions may be material in determining whether a constitutional violation occurred at all, but it is not directly at issue in determining qualified immunity.

prisoners cannot be forced to choose between adequate nutrition and compliance with their religious dietary requirements.[6] *LeBaron* v. *Spencer*, 527 F. App'x 25, 30 (1st Cir. 2013) (per curiam). I will not address any qualified immunity defense at this stage of the litigation with respect to kosher meals because I have concluded in Part V.A., above that no defendant has been shown to bear supervisory responsibility for any kosher meals claim. I will, nevertheless, in the interest of completeness, discuss the issue of kosher meals claims in Part V.C. below as a matter of record evidence not merely as to supervisory responsibility, but as to the underlying claims themselves.

Turning now specifically to Jewish religious services and access to a rabbi, the Supreme Court has held that while prisoners do not necessarily have a right to be led in group prayer at a particular time or for a particular service, a total deprivation of one faith's ability to participate in religious

---

[6] While this decision was under the more prisoner-friendly standards of RLUIPA, rather than the First Amendment directly, reasonable prison officials would know that they could not deny observant Jews adequate nutrition through kosher meals. Moreover, many courts have held similarly under the First Amendment. *See, e.g., Kahane* v. *Carlson*, 527 F.2d 492, 495 (2d Cir. 1975)("The courts have properly recognized that prison authorities must accommodate the right of prisoners to receive diets consistent with their religious scruples."); *Ward* v. *Walsh*, 1 F.3d 873, 879 (9th Cir. 1993)("inmates have the right to be provided with food that satisfies the dietary laws of their religion").

ceremonies violates the Constitution. *O'Lone* v. *Estate of Shabazz*, 482 U.S. 342, 352 (1987).

Addressing the religious services claim asserted against Nee, I observe at the outset that there is no clearly established law as to how hard a prison official must work to secure access to religious services for inmates when obstacles present themselves. An official like Anne Nee might discharge her obligations to provide religious services even without actually securing such access, should obstacles prove too daunting, and case law provides no guide as to what point that might be (nor at what point an official might reasonably believe she had done enough). This uncertainty is sufficient to provide Nee qualified immunity in this case. I cannot say on this record that a reasonable official in Defendant Nee's position, aware of the general obligation to provide religious services and counsel, knowingly violates the law or acts in a plainly incompetent fashion if she considers the efforts Nee made sufficient to meet her duties.

The case law does not require that every form of observance be made available to a prisoner. In *Estate of Shabazz*, the Supreme Court concluded that "[t]he record establishe[d] that respondents [we]re not deprived of all forms of religious exercise, but instead freely observe[d] a number of their

religious obligations."  482 U.S. at 352[7]; see also Kuperman v. Wrenn, 645 F.3d 69, 75 (1st Cir. 2011) ("Our inquiry is not into whether a religiously-acceptable alternative to growing a full beard existed.  Instead, we consider whether alternative means remained open for [the prisoner] to exercise the constitutionally-protected right at issue—here free exercise of his religion."); Ward v. Walsh, 1 F.3d 873, 877 (9th Cir. 1993) ("courts have found that although some aspects of religious practice were impinged upon, claimants retained the ability to participate in other significant rituals and ceremonies of their faith.").

With respect to obtaining a rabbi for Greene, the language is not fully prescriptive in Policy Statement IV.  The policy provides, "[w]hen a religious leader of an inmate's faith is not represented by the Department's chaplaincy staff or volunteers, the Department chaplain shall endeavor to assist the inmate in contacting a religious leader of the inmate's faith."  (emphasis

_____

[7] The Supreme Court in Cruz had earlier stated that it did not intend to "suggest, of course, that every religious sect or group within a prison — however few in number — must have identical facilities or personnel."  The Court recognized that "[a] special chapel or place of worship need not be provided for every faith regardless of size; nor must a chaplain, priest, or minister be provided without regard to the extent of the demand."  405 U.S. at 322 n.2.  Rather, the Court concluded, "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."  Id. (emphasis supplied).

added).  The question is whether Nee "endeavor[ed] to assist"
Greene in contacting a rabbi.  I find the record evidence
establishes that she did.

Nee arranged for Greene to be included in a service with a
rabbi on August 7, 2012.  To be sure, Greene, in his affidavit,
claims that on the one occasion a rabbi came to the HOC in 2012
"[w]hen [he] was called to leave for the service, [he] was using
the bathroom" and "[w]hen [he] was finished using the bathroom,
[he] was not permitted to leave [his] unit to attend the
service."  Even assuming that the lack of permission for Greene
then belatedly to attend the service is somehow an unreasonable
restriction of free exercise rights, I cannot say that this
restriction establishes knowing violations of constitutional
rights.  As demonstrated by Rabbi Berel Paltiel's emails to Nee,
Greene had the ability to reach out to rabbis on his own.  He
could have arranged for a visit from a rabbi on his own.  The
Department's Program Guide indicates that "[a]n inmate/detainee
can request his/her own clergy to visit them" and that "outside
clergy may request to visit inmates/detainees as long as the
outside clergy can provide the proper credentials of a religious
affiliation."  As the Ninth Circuit observed in *Ward*, 1 F.3d at
880, there is no affirmative obligation to provide a rabbi for a
prisoner.  I find the same to be true here.  Moreover, there is
no evidence in the record here that Defendants precluded visits

from rabbis or volunteers.

With respect to holding religious services, in her answers to Plaintiff's first set of interrogatories, Nee responded that upon receiving Greene's June 2013 grievance requesting a sabbath service, she contacted Rabbi Halpern regarding providing Jewish sabbath services. Rabbi Halpern informed her that a sabbath service could not take place because a minyan could not be met. Nee claimed that on June 27, 2013, case worker Marilyn Paniccia informed Greene that a sabbath service could not be performed but that the institution would try to arrange for a rabbi to visit him. Rabbi Halpern, however, informed Nee that he would not meet with Greene because he did not consider him to be Jewish insofar as he had not formally converted to Judaism. Nee did not stop there, she also contacted a reform rabbi, Rabbi Schatzberg, who agreed to visit with Greene, but due to a personal issue, was unable to do so. In her responses, Nee further indicated that, with respect to finding rabbi volunteers, she had spoken with religious contacts in the community, Jewish friends, and other community resources. In sum, Nee has demonstrated sufficient effort into remedying Greene's grievances.

As to the possibility of providing some form of communal religious service at the HOC that could satisfy Greene's religious needs, the record does not support a conclusion of

infringement of his religious liberties, let alone a knowing violation of clearly established law.  The record shows that Nee, in fact, did reach out to other rabbis concerning this matter, but was unsuccessful.  While Greene asserts that the number of inmates at the Jail and the HOC[8] during 2012 and 2013 could have met a minyan at certain points during those years, Nee has responded that "Greene was the first to request a Jewish Sabbath service at the House of Correction during the time frame specified."  *See Colvin* v. *Caruso*, 605 F.3d 282, 291 (6th Cir. 2010) ("This court has consistently permitted prisons to take into account the level of inmate interest in a particular religion when determining whether to hold services."); *Hall* v. *Tyszkiewicz*, 28 F. App'x 493, 495-96 (6th Cir. 2002) (unpublished) (The prisoner "admitted that there were insufficient interested inmates at his prison to hold a proper service.").  The record provides evidence speculative at best regarding inmate interest coincident with Greene's in particular types of services requiring a minyan.

Defendants maintain that Greene's requests for religious services were impossible, not because of action by them, but

---

[8] The HOC had 12 inmates in 2012 that identified as Jewish and 15 in 2013.  On June 6, 2013, 6 inmates at the HOC identified as Jewish.

because of the constraints of the Jewish faith.  I find some merit to this argument.  I do, however, recognize that Greene himself believed communal prayer to be essential.  In any event, nothing in Defendants' policies or practices prevented Greene from his individual prayer obligation.  In fact, Nee purchased a Torah for Greene.  Furthermore, as I will discuss in the next section, Greene was provided adequate kosher meals in observance of kashrut.  This case is unlike *Ward* where the only Orthodox Jewish prisoner did not have access to any forms of religious exercise other than his private prayer, which the Ninth Circuit deemed insufficient.  Accordingly, the record here establishes that Greene was not deprived of all forms of religious exercise, but instead freely observed a number of his religious obligations.  Under the circumstances, I find no violation of a clearly established constitutional right.  Summary judgment is appropriate on the religious services claim.

### C.    Kosher Meals

As a substantive matter, what remains of Plaintiff's claims concerning access to kosher meals are his concerns about contamination of his food on more than an incidental basis from trays, pots, and utensils that touched non-kosher food.  Defendants assert that, even drawing all reasonable inferences in favor of Plaintiff, it could not be found that the House of Corrections unconstitutionally served Greene non-kosher food.

27

With respect to the pots and utensils, there is no record evidence at all suggesting that cross-contamination ever occurred while Greene was an inmate at the House of Correction. Greene himself has no firsthand knowledge of how the kosher meals were prepared.  He only raises speculative concerns about potential gaps in Defendants' methods for ensuring that the laws of kashrut are followed.  For example, Plaintiff worries that although special diets are prepared using special utensils and religious meals are prepared before non-religious special meals, a non-kosher halal meal might be prepared before a kosher meal with the same pot or utensils.  Greene also doubts that a kosher certification by Rabbi Shapiro remained relevant after years had passed and kitchen conditions had changed.  These concerns combine two layers of speculation: speculation that adequate prophylaxis has not been used, and then speculation that cross-contamination actually resulted from the weakness in prevention. Such hypothetical speculation is insufficient to forestall summary judgment here, where the moving party has met its own burdens through unrebutted testimony of head chef Bartholomew. *See LeBaron* v. *Spencer*, 527 F. App'x 25, 30-31 (1st Cir. 2013) (per curiam) ("[A]ppellant, in order to create a question of fact, was required to have provided more detail regarding the allegedly small meal portions and high sodium levels.  In other

words, his allegations are too conclusory to create a question of fact regarding these issues.").

To be sure, Greene offers eyewitness testimony that the special diet trays he used were not properly kept kosher prior to 2012. According to Defendants, special diet trays were intermingled with each other, but side dishes were kept protected from the trays by individual wrappers, akin to cardboard hot dog containers. Greene states that such wrappers were not used and that side dishes were placed directly onto the trays, with a layer of plastic wrap covering the entire tray. This, according to Greene, would allow for cross-contamination from one kind of special diet to the kosher meals he was being served.

In *Gallagher* v. *Shelton*, 587 F.3d 1063, 1070 (10th Cir. 2009), the plaintiff claimed that the defendants violated his right to free exercise of religion by denying him his right to a kosher diet because his food was not prepared according to the kosher requirements. He specifically argued that the serving utensils that were reserved for the kosher food preparation were improperly cleaned with non-kosher utensils. *Id.* Upon reviewing the pleadings, the Tenth Circuit found that the plaintiff had alleged a single violation of his kosher diet, not a prison policy. *Id.* "Taking [the plaintiff's] allegations as true, the fact that the utensils were not properly washed

indicate[d] that the defendants imperfectly implemented the kosher requirements, or were even negligent in implementing his kosher diet.  But there [wa]s no basis to conclude that any of the defendants deliberately contaminated the kosher utensils, in violation of [the plaintiff's] right to free exercise of religion, or that defendants repeatedly violated kosher requirements."  *Id.*  Therefore, "such an isolated act of negligence d[id] not support a claim that [the plaintiff] was denied his First Amendment right to free exercise of religion." *Id.; see also Hayes* v. *Bruno*, 171 F. Supp. 3d 22, 33 (D. Conn. 2016) ("[E]ven if a violation could be inferred, the situations described d[id] not tend to show that the entire Common Fare meal preparation process fail[ed] to comply with Jewish dietary law.").

Similarly here, Greene's testimony that the special diet trays he used were not properly kept kosher prior to 2012 indicates that Defendants may have "imperfectly implemented the kosher requirements, or were even negligent in implementing his kosher diet."  However, there is no basis in the record before me to conclude that Defendants deliberately allowed cross-contamination, in violation of Greene's right to free exercise of religion.  Summary judgment would therefore be appropriate on the merits of this claim, even if limitations on supervisory

liability did not otherwise provide a basis for summary judgment.

## D.    *State Law Claims*[9]

In addition to Plaintiff's claims under § 1983, he also brings suit under the Massachusetts Civil Rights Act for violations of his rights to religious freedom.  The MCRA is largely "coextensive with 42 U.S.C. § 1983." *Batchelder* v. *Allied Stores Corp.,* 473 N.E.2d 1128, 1131 (Mass. 1985).  The primary difference between the two statutes is that the MCRA, unlike its federal counterpart, does not require state action. *Id.*  In the context of a state prison, this distinction is of no import, of course.  Thus, in the absence of a reason to hold otherwise, the disposition of Plaintiff's MCRA claims should be the same as his parallel claims under federal law.[10]

---

[9] I note these claims were pressed in the first round of summary judgment practice, but not renewed in this one.  I discussed basic issues regarding them from the bench during the most recent hearing.  In the interests of completeness, I provide a short written discussion here.

[10] I note also that I would reject two other explanations offered by Defendants why summary judgment should be granted on the MCRA claims.  First, the MCRA only creates liability for the interference of rights through "threats, intimidation or coercion."  Mass. Gen. Laws ch. 12, § 11H.  Defendants claim that no threats or coercion was present in this case.  However, Massachusetts sets a low bar for what constitutes coercion under the MCRA.  The order of a uniformed security guard, carrying an "implicit threat" of ejection from private premises has been held to be enough, as was infringement on a contract right. *Bally* v. *Ne. Univ.*, 532 N.E.2d 49, 53 (Mass. 1989) (citing *Batchelder II*, 473 N.E.2d 1128; *Redgrave* v. *Boston Symphony Orchestra, Inc.*, 502 N.E.2d 1375, 1377 (Mass. 1987)).  If those

Accordingly, I find that the resolution of summary judgment as to Plaintiff's federal § 1983 claims governs his parallel MCRA claims.

## VI. CONCLUSION

For the reasons set forth above, Defendants' motion [Dkt. #62] for summary judgment is GRANTED.  This disposes of the last of the outstanding claims in this case.  Accordingly, the Clerk is directed to enter judgment for the Defendants.

Plaintiff's motion [Dkt. #66] to strike the affidavit of Rabbi Rosenberg is GRANTED only to the extent that the sanction of $2,000 under Fed. R. Civ. P. 37(c)(1)(A) will be imposed for the affidavit's untimely tender.  This sanction shall be paid over directly to Plaintiff's counsel on or before July 13, 2018.

*/s/ Douglas P. Woodlock*_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

---

circumstances constitute coercion, there can be no doubt that the policies of a prison – an institution with strict disciplinary control over every aspect of an inmate's life – plainly constitute coercion under the MCRA.

Second, Defendants assert that "public officials are not liable under the MCRA for their discretionary acts."  This purported standard, which would render the MCRA toothless, is not Massachusetts law.  Rather, "public officials are not liable under the [MCRA] for their discretionary acts, *unless* they have violated a right under Federal or State constitutional or statutory law that was 'clearly established' at the time." *Williams* v. *O'Brien*, 936 N.E.2d 1, 4 (Mass. App. Ct. 2010) (emphasis added).  Massachusetts, in other words, essentially incorporates the qualified immunity doctrine of § 1983.